**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RESTAURANT.COM, INC, a Delaware corporation, | |
| Plaintiff, | No. 08 CV 2978 |
| v. | Honorable Judge Aspen |
| STEVE SAVAD, an individual residing in New York | Magistrate Judge Valdez |
| Defendant. | |

**SAVAD'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS**

Defendant Steve Savad ("Savad") moves to dismiss the Complaint of Restaurant.com, Inc. ("RDC") in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

**INTRODUCTION**

Savad was one of the founders of RDC. (Complaint, ¶2). He served as an officer and director of RDC from 1998 through 2007 and has also been a minority shareholder (12%) of RDC since the company was founded. (Affidavit of Steve Savad ("Savad Aff."), ¶1). (Attached hereto as Exhibit A). In January 2008, Savad was suddenly and unexpectedly fired by RDC without cause at the direction of certain officers and directors who own a majority of RDC's stock. (Savad Aff., ¶2). Shortly thereafter, on April 25, 2008, Savad was lured from his home in New York to attend a meeting at RDC's office in Arlington Heights, Illinois for the purported purpose of negotiating the sale of his RDC stock to the majority shareholder. (Savad Aff., ¶2). Instead of engaging in good faith negotiations with Savad, the majority shareholders instead used the opportunity to serve Savad with a copy of a summons and complaint that the company had

already filed with the Court eight days earlier.  (Savad Aff., ¶3).  The unidentified person who served Savad was not a member of the Cook County Sheriff's office nor was he a process server appointed by the Court.  (Affidavit of Gina Amadei, ¶4).  (Attached hereto as Exhibit B).  The complaint contains a single count for breach of an employment contract and seeks injunctive and other relief.

The complaint against Savad should be dismissed for three separate and distinct reasons.  First, Savad was not properly served with the summons and complaint.  Illinois Supreme Court Rule 102 requires that the summons and complaint shall be placed for service with the sheriff or other officer or person authorized by the court.  The person who served Savad does not fall within any of these categories.  Therefore, service was improper and requires dismissal of the complaint under Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process.  Second, RDC attached to its complaint a copy of the employment contract at issue.  A review of the contract reveals that the conduct of which RDC complains does not violate any of the terms of the contract and thus undermines RDC's claim for breach of contract.  Third, the specific restrictive covenant that RDC contends Savad violated is unenforceable as a matter of law.  As such, RDC's complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## ARGUMENT

### I.     RDC's Complaint Should Be Dismissed Pursuant To Federal Rule of Civil Procedure 12(b)(5) Because Savad Was Not Properly Served.

Illinois Supreme Court Rule 102 governs the requirements for serving the summons and complaint.  That Rule provides:

> Promptly upon issuance, summons (together with copies of the complaint as required by Rule 104), shall be placed for service with the sheriff or other officer or person authorized to serve process.

RDC ignored this rule and used some unidentified person who was not from the sheriff's office and who was not authorized by the Court to serve Savad. Savad's counsel confirmed with the Cook County Sheriff's Office that no summons relating to the instant case had been placed there and the state court records show that RDC never filed a motion to appoint a special process server. (Affidavit of Gina Amadei, ¶3). As such, the service is defective, and RDC's complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5).

**II.     RDC's Complaint Should Also Be Dismissed Pursuant To Federal Rule Of Civil Procedure 12(b)(6) Because The Conduct Complained Of Did Not Violate The Contract And Because The Covenant At Issue Is Unenforceable In Any Event.**

In order to survive a motion to dismiss, a complaint must first describe the claim in sufficient detail to give the Defendant "fair notice of what the … claim is and the ground upon which it rests." *EEOC v. Concentra Health Services, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). "Second, its allegations must plausibly suggest that the plaintiff has the right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.* Here, the plain language of the contract itself dooms RDC's claim for breach of contract.

**A.     Mere solicitation of employees is not prohibited by the contract**

In the instant case, RDC alleges that Savad has breached his employment contract. However, RDC then pleads itself out of court by attaching to the complaint the contract in question which definitely establishes that no such breach occurred. The only alleged breach that RDC purports to base its contract claim on is an alleged violation of the non-solicitation provisions contained in Section 7(c) of the employment agreement between Savad and RDC ("Employment Agreement"). The Employment Agreement is attached hereto as Exhibit C. That section of the Employment Agreement expressly provides:

> <u>Non-Solicitation and Non-Pirating.</u>  Executive hereby agrees that, during the Restricted Period, he will not, directly or indirectly, for himself or on behalf of any other person, firm, entity or other

enterprise: (i) solicit for purposes of providing products or services that are the same or substantially similar to that provided by the Corporation, or in any way divert or take away any person or entity that, prior to the date in question, was a client, customer, payor, referral source, or facility of the Corporation or any of its affiliates; or (ii) hire, entice away or in any other manner persuade any person who was an employee, consultant, representative or agent of the Corporation or any of its affiliates on or at any time within one (1) year prior to the date in question, to alter, modify or terminate their relationship with the Corporation or any of its affiliates.

RDC erroneously summarizes Section 7(c) of the Employment Agreement as an agreement by Savad "not to solicit Restaurant.com's <u>employees</u> or customers for a period of one year after his employment with the company ended." (Complaint, ¶8) (emphasis added). RDC's summary of Section 7(c) of the Employment Agreement is disingenuous at best and intentionally misleading at worst. Simply stated, Savad only agreed not to solicit RDC's <u>customers</u>. As for RDC employees, Savad only agreed not to actually hire any of them. There is no prohibition on the mere solicitation of employees.[1]

This distinction between whom Savad agreed not to solicit and whom Savad agreed not to hire is the critical issue in this case because the only conduct that RDC complains of in its Complaint is Savad's alleged "solicitation" of RDC <u>employees</u>. The only specific allegations of wrongdoing alleged by RDC appear in Paragraphs 13 through 19 of RDC's Complaint. There, RDC alleges that "Savad has repeatedly violated his Non-Solicitation Agreement by attempting to lure away the company's top Regional Sales Managers," that Savad "has improperly personally solicited at least two of its employees, Jordan Vazquez and James Carso," and that "[o]n information and belief, Savad may have solicited other Restaurant.com's employees." In

---

[1] "Where the allegations of a pleading are inconsistent with the terms of a written contract attached as an exhibit, the terms of the latter, fairly construed, must prevail over the averments differing there from." *Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F3d 523, 529 (7th Cir. 1999). "To this end it is indeed true that 'a plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to a judgment'". *Id.*

similar fashion, in the paragraphs under the heading "Count I – Breach of Contract," RDC again misstates the terms of the agreement by alleging that Savad agreed not to solicit any employees or customers of Restaurant.com. (Complaint, ¶24). Then RDC goes on to allege that "Savad has repeatedly solicited <u>employees</u> of Restaurant.com since his employment with the company ended in January 2008 …." (Complaint ¶25) (emphasis added)

Based on the foregoing and the allegations of the Complaint, RDC has failed to state a claim for breach of contract. The provision in the Employment Agreement upon which RDC relies -- Section 7(c) -- prohibits only two types of activities: (1) the solicitation of RDC customers and (2) the actual hiring of RDC employees. RDC has not alleged that Savad solicited any of its customers nor has RDC alleged that Savad actually hired any of its employees. Thus, under the clear terms of the Employment Agreement, RDC has failed to allege any breach of contract by Savad.

### B.    The covenant restricting the hiring of RDC employees is unenforceable as a matter of law

Even if Savad had successfully hired RDC employees (which he did not), RDC would still fail to state a claim for breach of contract because non-recruitment covenants constitute an invalid restraint on trade and are unenforceable under Illinois law. *See Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977, 983 (C.D. Ill. 2003). The *Unisource* case is the only reported federal case addressing the enforceability of non-recruitment covenants under Illinois law. In *Unisource*, the court noted that "the only two 'legitimate business interests' that may give rise to a covenant not to compete in Illinois are 'near permanent' relationships with customers, and confidential information or trade secrets." *Id.* at 983. Since a non-recruitment covenant falls into neither category, the court concluded that "the covenant restricting

[defendant] from soliciting or hiring other [plaintiff] employees is an invalid restraint on trade." *Id.*

The issue was also addressed in an unreported Northern District of Illinois case, *YCA, LLC v. Berry,* 2004 WL 1093385 (N.D. Ill. May 7, 2004) (Leinenweber, J.). In *YCA*, the court decided that non-recruitment covenants are enforceable only to the extent that they are narrowly drafted to guard an employer's confidential information from competitors. However, the court noted that if the covenant bars a defendant from recruiting any employee for any business then the covenant is overbroad and thus unenforceable. In finding the non-recruitment covenant in the case before it unenforceable, Judge Leinenweber noted:

> [I]t bars Berry from recruiting *any* YCA employees for *any* business, even for businesses doing wholly different lines of work, in geographic areas where YCA does not even function. The Court cannot understand what legitimate business purpose is accomplished by so broad a restrictive covenant. Indeed, to demonstrate the absurdity of this covenant, the Court notes that it would theoretically prevent Berry from recruiting a YCA's janitor to work as postal carrier in Somalia.

*Id.* at *18 (emphasis in original).

The "non-pirating" clause in the instant case is as broad as, and perhaps even broader than, the one in *YCA*. It prohibits Savad from hiring "*any* person who was an employee, consultant, representative or agent of the Corporation" and even prohibits Savad from simply persuading any such person "to alter, modify or terminate their relationship with the Corporation" regardless of whether they accept employment with anyone else. Since the covenant in the instant case is not limited to a legitimate business interest and is extremely overbroad, it is unenforceable under Illinois law just like the covenant at issue in *YCA*. Because the covenant is unenforceable under both *Unisource* and *YCA*, it could not be breached by Savad

even if he had hired an RDC employee.[2]  As such, for this additional reason, RDC fails to state a claim for breach of contract as a matter of law.

<u>**CONCLUSION**</u>

For the reasons stated above, Steve Savad respectfully requests that this Court grant his motion, dismiss RDC's complaint in its entirety and with prejudice, and award Savad any further relief that the Court deems just and proper.

Dated:  May 29, 2008　　　　　　　　　　　　　Steve Savad

　　　　　　　　　　　　　　　　　By:___s/  Steven E. Cyranoski_____
　　　　　　　　　　　　　　　　　　　One of His Attorneys

Michael A. Stiegel
Steven E. Cyranoski
MICHAEL BEST & FRIEDRICH LLP
Two Prudential Plaza
180 N. Stetson Ave., Suite 2000
Chicago, Illinois 60606
Phone: (312) 222-0800

---

[2] There is an Illinois state court decision from 16 years ago, *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 76, 589 N.E.2d 640, 649 (1992), which held that a covenant restricting the solicitation of employees is enforceable because it protects an employers interest in maintaining a stable work force.  However, that state appellate court case is not binding on this Court and neither of the federal cases discussed above adopted its holding.

## <u>CERTIFICATE OF SERVICE</u>

I, Steven E. Cyranoski, an attorney, certify that on May 29, 2008, I filed the foregoing Savad's Memorandum of Law in Support of His Motion to Dismiss with the Clerk of the District Court, using the CM/ECF system which will send electronic notification of such filing to the following counsel of record:

<u>Attorney for Plaintiff</u>

Martin B. Carroll
mcarroll@fhslc.com
Travis B. Wolfinger
twolfinger@fhslc.com
Fox, Hefter, Swibel, Levin & Carroll, LLP
200 West Madison Street, Suite 3000
Chicago, Illinois 60606


/s/ Steven E. Cyranoski

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RESTAURANT.COM, INC, a Delaware
corporation,

        Plaintiff,

   v.

STEVE SAVAD, an individual residing in
New York

        Defendant.

No.

## AFFIDAVIT OF STEVE SAVAD

I, Steve Savad, having been duly sworn, state that if called to testify, I would state as follows:

1.　　I was one of the original founders of Restaurant.com ("RDC"), and I served as an officer and director of RDC from 1998 through 2007. I have also been a minority shareholder of RDC since the company was founded.

2.　　In January 2008, I was suddenly and unexpectedly fired by RDC without cause at the direction of certain officers and directors who own a majority of RDC's stock. Shortly thereafter, I was invited to attend a meeting on April 25, 2008 at RDC's office in Arlington Heights, Illinois for the purported purpose of negotiating the sale of my RDC stock to the majority shareholder. At that time, my residence was in New York, as it is today. I traveled from New York to Arlington Heights, Illinois to attend the meeting at RDC's office on April 25, 2008.

3.　　Instead of engaging in good faith negotiations with me, the majority shareholders instead used the opportunity to serve me with a copy of a summons and complaint. The court stamp on the documents indicated that they had been filed with the Court on April 17, 2008, eight days prior to my visit.

4.　　The person who handed me the summons and complaint did not identify himself nor was he identified by anyone else in the room. He did not identify himself as a Cook County sheriff's officer nor was he wearing any type of police uniform. He did not identify himself as a special process server appointed by the Court.

                                    Steve Savad

County of New York     )
                      ) ss.
STATE OF NEW YORK   )

SUBSCRIBED AND SWORN TO before me, the undersigned notary public, on the 23rd day of May, 2008 to which witness my hand and seal of office.

_____
Notary Public

My Commission Expires:

MOHINDER S. GULATI
Notary Public, State of New York
No. 01GU4659367
Qualified in New York County
Commission Expires Nov. 30, 2010

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RESTAURANT.COM, INC, a Delaware
corporation,

                 Plaintiff,

     v.

STEVE SAVAD, an individual residing in
New York

                 Defendant.

No. 08 CV 2978

### AFFIDAVIT OF GINA AMADEI

    I, Gina Amadei, having been duly sworn, state that if called to testify, I would state as follows:

    1.    I am currently employed as a legal assistant at the law firm of Michael Best & Friedrich LLP. Our firm currently represents Steve Savad ("Savad") in the lawsuit filed against him by Restaurant.com, Inc. ("RDC").

    2.    I was asked by attorneys at our firm to investigate the service of the summons on Savad and to determine whether he had been served by the Cook County Sheriff's office or by a special process server.

    3.    I went online and visited the website for the Cook County Circuit Clerk in order to pull up the docket sheet for the lawsuit RDC filed against Savad. Attached hereto is a copy of the docket sheet as of May 15, 2008. The docket sheet does not indicate that any motion was filed by RDC requesting the appointment of a special process server.

    4.    I also called the Cook County Sheriff's office and was informed that no summons relating to the lawsuit filed by RDC against Savad had been placed with the Cook County Sheriff's office for service.

                                                 Gina Amadei

County of Cook            )
                            ) ss.
STATE OF ILLINOIS     )

    SUBSCRIBED AND SWORN TO before me, the undersigned notary public, on the 29th day of May, 2008 to which witness my hand and seal of office.

Notary Public

My Commission Expires:

OFFICIAL SEAL
KATHRYN LUSSKY
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:01/30/10



*Dorothy Brown*

# Clerk *of the* Circuit Court

*Cook County*

Case Information Summary for Case Number
2008-CH-14366

Filing Date: 4/17/2008
Division: Chancery Division
Ad Damnum: $0.00

Case Type: INJUNCTION
District: First Municipal
Calendar: 02

## Party Information

**Plaintiff(s)**
RESTAURANT COM INC

**Attorney(s)**
FOX HEFTER SWIBEL & CARRO
200 W MADISON#3000
CHICAGO IL, 60606
(312) 224-1200

**Date of Service**    **Defendant(s)**
SAVAD STEVE

**Attorney(s)**

## Case Activity

Activity Date: 4/17/2008

Participant: RESTAURANT COM INC

INJUNCTION COMPLAINT FILED

Court Fee: 319.00

Attorney: FOX HEFTER SWIBEL & CARRO

Activity Date: 4/22/2008

Participant: RESTAURANT COM INC

CASE SET ON CASE MANAGEMENT CALL

Date: 9/17/2008
Court Time: 1000
Court Room: 2601

Judge: BILLIK, RICHARD J. JR.
Attorney: FOX HEFTER SWIBEL & CARRO

Activity Date: 5/13/2008

Participant: RESTAURANT COM INC

MOTION SCHEDULED (MOTION COUNTER ONLY)

Date: 5/23/2008                          Attorney: FOX HEFTER SWIBEL &
Court Time: 0930                         CARRO

Activity Date: 5/13/2008                 Participant: RESTAURANT COM INC

***MISC.MOTION(SET FOR MOTION HEARING)

Date: 5/23/2008                          Attorney: FOX HEFTER SWIBEL &
Court Time: 0930                         CARRO

---

Please note: Neither the Circuit Court of Cook County nor the Clerk of the
Circuit Court of Cook County warrants the accuracy, completeness, or the currency
of this data. This data is not an official record of the Court or the Clerk and may
not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data
in our master database.

Return to Search Page

# EXHIBIT C

# EMPLOYMENT AGREEMENT

This Agreement is made and entered into as of ~~September 14, 2001~~ *Oct, 12, 2001* by and between Restaurant.com, Inc., a Delaware corporation, hereinafter called the "Corporation", and Steve Savad, hereinafter called the "Executive".

**WHEREAS,** the Corporation desires to continue to employ Executive as the Corporation's Chief Financial Officer and Executive desires to continue to be employed as the Corporation's Chief Financial Officer on the terms and conditions as set forth herein.

**NOW THEREFORE,** in consideration of the covenants herein contained, the monies to be paid hereunder, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to the following terms and conditions:

1.    **Employment**. The Corporation hereby employs the Executive as its Chief Financial Officer, and the Executive hereby agrees to such employment, on the terms and conditions described in this Agreement. Executive is being employed directly by the Corporation as a salaried employee, and will be compensated for the services rendered as herein provided.

2.    **Duties and Performance**. Executive hereby agrees that, throughout the period of his employment hereunder, he shall devote his best efforts on a full time basis, diligently in furtherance of the business of the Corporation, shall perform the duties assigned to him by the President and Board of Directors of the Corporation consistent with his executive position with the Corporation, and shall observe and carry out such rules and regulations, policies and directions as the Corporation may from time to time establish to the extent consistent herewith. During the term of this Agreement, Executive shall do such traveling as may be reasonably required of him in the performance of his duties on behalf of the Corporation consistent with travel during periods prior to the date hereof. Executive shall be available to confer and consult with and advise the officers and directors of the Corporation at such times during business hours that may be reasonably required by the Corporation. Executive, in his capacity as an employee of the Corporation shall report directly and solely to the President and the Board of Directors of the Corporation.

3.    **Compensation.**

      **(a)**    **Base Salary.** So long as Executive is employed pursuant to this Agreement, the Corporation shall pay to Executive, as compensation for Executive's services hereunder, a base salary at the rate of One Hundred and Twenty Thousand Dollars ($120,000) per year (the "Annual Base Salary"). Executive shall be paid periodically in accordance with the policies of the Corporation during the term of this Agreement, but not less frequently than monthly.

      **(b)**    **Signing Bonus**. On the effective date of this Agreement, the Corporation shall grant to Executive an immediately exercisable option under its 1999 Stock Option Plan to purchase up to 1,414,386 shares of its common stock at an exercise price of 2.4 Cents ($0.024) per share in accordance with the Option Agreement attached hereto as Exhibit A.

      **(c)**    **Bonuses.** Executive will be included in a bonus plan, the terms of which shall be subject to approval by the President and the Chairman of the Board, with the input of the Executive. Said bonus plan will be created within 90 days of execution of this agreement.

      **(d)**    **Benefits.** Executive shall be entitled to participate in and receive the benefits of all pension, profit-sharing, deferred compensation, retirement, hospitalization, insurance, medical or dental or other

benefit plan or arrangement generally available to executive employees of the Corporation as may now or hereafter exist. Executive shall also be entitled to participate in or receive all other benefits and perquisites generally available to executives of the Corporation that may be in effect from time to time during the Executive's employment hereunder. The Corporation shall be under no obligation to institute or continue the existence of any such employee plan, benefit or perquisite.

(e)     **Expenses.**  The Corporation shall reimburse Executive promptly upon presentation of receipts or vouchers thereof, for all expenses reasonably incurred by him in connection with the performance of his duties hereunder and the business of the Corporation, in accordance with policies of the Corporation from time to time in effect.

(f)     **Vacation.**  Executive shall be entitled to receive three (3) weeks paid vacation time per each year of employment upon dates agreed upon by the Corporation. Upon separation of employment, for any reason, vacation time accrued and not used shall be paid at the salary rate of Executive in effect at the time of employment separation. Vacation time not used in a given year will be forfeited, unless otherwise agreed to in writing by the President of the Corporation.

4.     **Executive's Representations.**  Executive is free to enter into this Agreement and to perform each of the provisions contained herein. Executive represents and warrants that Executive is not restricted or prohibited, contractually or otherwise, from entering into and performing this Agreement, and that Executive's execution and performance of this Agreement is not a violation or breach of any agreement between Executive and any other person or entity. Executive further represents, warrants, and covenants to the Corporation that (a) he is not bound by any agreement with any prior employer or other party to refrain from using or disclosing any confidential information or from competing with the business of such employer or other party and (b) his performance under this Agreement will not breach any other agreement by which he is bound.

5.     **Term of Employment.**  The employment of Executive pursuant to this Agreement shall commence on the date hereof, and, if not sooner terminated pursuant to the provisions hereof, shall end on the third anniversary of the date hereof, unless extended by the written agreement of both parties hereto ("Termination Date").

6.     **Termination of Employment.**

(a)     **Termination by the Corporation Without Cause.**  The Corporation shall have the right to terminate the Executive's employment hereunder without cause by giving the Executive written notice to that effect. Any such termination of employment shall be effective on the date specified in such notice. In the event that this Agreement is terminated pursuant to this Section 6(a), then: (i) the Corporation shall continue to pay the Executive the Annual Base Salary, for the period ending on the earlier of (A) the date which is three (3) months after the effective date of the termination or (B) the Termination Date (the "**Salary Continuation Period**"). In addition, in the event of any termination pursuant to this Section 6(a), (i) the Executive may elect health care continuation coverage under COBRA or any applicable state law governing health care continuation coverage, under the employee healthcare benefit plan in which he participated in accordance with the terms thereof, and in such event, the Corporation shall pay the same portion of the premium it would have paid had the Executive remained an employee, continuing for the period ending on the earlier of (A) the termination of the applicable statutory period for such healthcare continuation coverage, or (B) the expiration of the Salary Continuation Period; (ii) the Corporation shall pay the Executive any business expenses remaining unpaid on the effective date of the termination for which the Executive is entitled to be reimbursed under Section 3(e) of this Agreement; and (iii) the Corporation shall pay the Executive any accrued but unused vacation pay; <u>provided, however,</u> that without limiting any other remedy available hereunder, the salary continuation and healthcare benefit payments shall immediately terminate upon a breach by the Executive of the provisions of Sections 4 or 7

hereof; provided, further, that, as a condition to receiving the salary continuation and health care benefits under this Section 6(a), Executive shall execute and deliver to the Corporation upon such termination a general release reasonably acceptable to the Corporation.

**(b)      Termination by the Corporation for Cause.** The Corporation shall have the right to terminate this Agreement and the Executive's employment hereunder "for cause" by giving the Executive written notice to that effect. Any such termination of employment shall be effective on the date specified in such notice. In the event of such termination, the Corporation shall pay to the Executive (i) his unpaid Annual Base Salary earned pursuant to this Agreement through the effective date of the termination, (ii) his accrued but unpaid vacation, and (iii) any business expenses remaining unpaid on the effective date of the termination for which the Executive is entitled to be reimbursed under Section 3(e) of this Agreement. For the purpose of this Agreement, "for cause" shall mean:

(1)      Executive's performance of any of the essential duties assigned to Executive in a negligent manner that is materially economically detrimental to the Corporation or its affiliates, or with intentional disregard for the best interests of the Corporation or its affiliates; or

(2)      Executive's willful insubordination or refusal to follow instructions or directions; or

(3)      Executive's conviction of, enter of a plea of nolo contendere to or confession to any felony or any other act of theft, embezzlement, obtaining funds or property under false pretenses, or similar act of material misconduct with respect to the property of the Corporation or any of its affiliates or any of their respective employees, or which has a material detrimental effect on the reputation of the Corporation; or

(4)      Executive's habitual insobriety or substance abuse (as determined in good faith by the Corporation's board of directors), material act of malfeasance, dishonesty or breach of trust with respect to the Corporation or any of its affiliates, or which has a material detrimental effect on the reputation of the Corporation; or

(5)      Executive's breach, in any material respect, of any of his obligations, representations or warranties under this Agreement, provided, however that no termination under this subparagraph (5) or subparagraph (2) shall be effective unless the Executive does not cure such refusal or breach to the Corporation's satisfaction as soon as practicable after the Corporation gives the Executive written notice identifying such refusal or breach (and, in any event, within thirty (30) calendar days after receipt of such written notice).

No act or failure to act on the part of the Executive shall be considered willful unless it is done, or omitted to be done, by the Executive in bad faith or without reasonable belief that his action or omission was in the best interest of the Corporation.

**(c)      Death, Incapacitation or Disability.** If the Executive dies during his employment hereunder, this Agreement shall terminate upon the date of the Executive's death. In the event of any such termination, the Corporation shall pay to the Executive's representative or his estate any unpaid Annual Base Salary earned pursuant to this Agreement through the effective date of termination, accrued but unused vacation pay, and any business expenses remaining unpaid on the effective date of the termination for which the Executive is entitled to be reimbursed under Section 3(e) of this Agreement. The Executive shall be deemed to be "disabled" if, by reason of illness or incapacity he is incapable of performing his duties hereunder for either (i) one (1) continuous period of six (6) months, or (ii) a total of seven (7) months out of any twelve (12) consecutive months. The Corporation shall have the right to terminate the Executive's employment hereunder for disability

by giving the Executive thirty (30) days written notice to that effect.  In the event of any such termination, the Corporation shall pay to the Executive any unpaid Annual Base Salary earned pursuant to this Agreement through the effective date of termination any accrued but unused vacation pay and any business expenses remaining unpaid on the effective date of the termination for which the Executive is entitled to be reimbursed under Section 3(e) of this Agreement.  In addition, upon his election under COBRA (or applicable state law), the Executive may continue coverage, for the applicable statutory period, under the employee healthcare benefit plan in which he participated in accordance with the terms thereof, and in such event, the Corporation shall pay the same portion of the premium it would have paid had the Executive remained an employee, continuing until the period ending on the later of (i) the date which is three (3) months after the effective date of termination or (ii) the Termination Date; provided, however, that the Corporation shall have no obligation to pay for such health care continuation coverage beyond the statutory period for which such benefits are available.

(d)    **Termination by the Executive for Good Reason.**  The Executive shall have the right to terminate this Agreement and his employment hereunder for "good reason", if (I) the Executive shall have given the Corporation prior written notice of the reason therefor, (II) such notice shall have been given to the Corporation within fifteen (15) days after the Executive is notified or otherwise first learns of the event constituting "good reason," and (III) a period of fifteen (15) days following receipt by the Corporation of such notice shall have lapsed and the matters which constitute or give rise to such "good reason" shall not have been cured or eliminated by the Corporation; provided, however, that if such matters are of a nature that same cannot be cured or eliminated within such fifteen (15) day period, such period shall be extended up to forty five (45) days, provided that the Corporation shall take and diligently pursue during such period such action necessary to cure or eliminate such matters.  In the event the Corporation shall not take such action within such period, the Executive may send another notice to the Corporation electing to terminate his employment hereunder and, in such event, the Executive's employment hereunder shall terminate and the effective date of such termination shall be the third business day after the Corporation shall have received such notice.  In the event that Executive elects to terminate this Agreement pursuant to this Section 6(d), he shall be entitled to the salary and benefits as set forth in Section 6(a) upon a termination of employment by the Corporation without cause, on the same terms as set forth in Section 6(a).  For the purpose of this Agreement, "good reason" shall only mean the occurrence of any of the following without the Executive 's prior written consent:

(1)    requiring the Executive to engage in any illegal act;

(2)    requiring the Executive to engage in any act which could reasonably be deemed to be materially damaging or detrimental to the Executive; or

(3)    a default by the Corporation in the payment of any material sum or the provision of any material benefit due to the Executive pursuant to this Agreement; provided, however, that if the Corporation disputes Executive's claim that Executive is entitled to such material sum or material benefit, then good reason shall not exist under this clause (2) unless the Corporation defaults in the payment of such material sum or the provision of such material benefit after fifteen days following the final and non-appealable adjudication of the dispute;

(e)    **Termination by the Executive Without Good Reason.**  The Executive shall have the right to terminate this Agreement and his employment hereunder without good reason by giving the Corporation thirty (30) days prior written notice to that effect.  The termination of employment shall be effective on the date specified in such notice, or earlier, at the determination of the Corporation, in which event such termination shall remain classified as a termination by the Executive without good reason.  In the event of such termination, the Executive shall be entitled to receive the same payments and benefits as would be provided under subsection 6(b) in the event of a termination for cause.

**(f)**    <u>Resignation as Officer and Director Upon Termination</u>. Upon termination of this Agreement, other than by the Corporation without cause under Section 6(a), the Executive shall be deemed to have resigned any and all of his positions on the board of directors of the Corporation (and subsidiaries, if any) and officer positions with the Corporation (and subsidiaries, if any).

7.    <u>Restrictive Covenants</u>.

**(a)**    <u>Non-Compete</u>. Executive hereby agrees that so long as he is employed by the Corporation or any of its affiliates pursuant to this Agreement or otherwise, and during the one (1) year period commencing on the date of termination of such employment (collectively, the "Restricted Period"), he will not, directly or indirectly, own, manage, operate, join, control or participate, or have a proprietary interest in, the ownership, management, operation or control, of or be connected with, in any manner, any online restaurant promotion or restaurant information servicing, that provides services or products (including, without limitation, through the mail or courier services) anywhere in the United States. The foregoing notwithstanding, if Executive is terminated by the Corporation for other than "cause" under Section 6(a) or Executive properly terminates this agreement for good reason under Section 6(d), he shall not be subject to the restrictions contained in this Section 7(a).

**(b)**    <u>Confidential Information</u>. In the course of Executive's performance of his obligations as an employee of the Corporation or its affiliates, Executive will have access to confidential and proprietary information of the Corporation and its affiliates (collectively, "Trade Secrets"), including, without limitation, with respect to some or all of the following categories of information: (i) financial information, including but not limited to information relating to earnings, assets, debts, prices, pricing structure, reimbursement matters, volume of purchases or sales or other financial data whether related to the Corporation, or to particular products, services, geographic areas, or time periods; (ii) supply and service information, including but not limited to information relating to goods and services, suppliers' names or addresses, terms of supply or service contracts or of particular transactions, or related information about potential suppliers to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of a particular supplier, though generally known or available, may yield advantages to the Corporation, details of which are not generally known; (iii) marketing information, including but not limited to information relating to details about ongoing or proposed marketing programs or agreements by or on behalf of the Corporation, sales forecasts, advertising formats and methods or results of marketing efforts or information about impending transactions; (iv) personnel information, including but not limited to information relating to employees' personal or medical histories, compensation or other terms of employment, actual or proposed promotions, hirings, resignations, disciplinary actions, terminations or reasons therefor, training methods, performance, or other employee information; (v) customer information, including but not limited to information relating to names, addresses or backgrounds of past, existing or prospective clients, customers, referral sources, records of agreements and prices, proposals or agreements between any of them and the Corporation, status of accounts or credit, as well as customer lists; and (vi) Inventions and technological information, including but not limited to information related to proprietary technology, trade secrets, research and development data, processes, formulae, data and know-how, improvements, techniques, and information that has been created, discovered or developed, or has otherwise become known to the Corporation, and/or in which property rights have been assigned or otherwise conveyed to the Corporation, which information has commercial value in the business in which the Corporation is engaged. Except in furtherance of his obligations as an employee of the Corporation or its affiliates, Executive shall hold all Trade Secrets in confidence and will not discuss, communicate or transmit to others, or make any unauthorized copy of or use any of the Trade Secrets; and will take all reasonable actions that the Corporation deems reasonably necessary or appropriate, to prevent unauthorized use or disclosure of or to protect the Corporation's interest in the Trade Secrets. The foregoing does not apply to information that by means other than deliberate or inadvertent disclosure by Executive, becomes well known to the public; or disclosure compelled by judicial or administrative proceedings after they diligently try to avoid each disclosure and afford the Corporation the

opportunity to obtain assurance that compelled disclosures will receive confidential treatment.

    **(c)**    <u>Non-Solicitation and Non-Pirating</u>. Executive hereby agrees that, during the Restricted Period, he will not, directly or indirectly, for himself or on behalf of any other person, firm, entity or other enterprise: (i) solicit for purposes of providing products or services that are the same or substantiality similar to that provided by the Corporation, or in any way divert or take away any person or entity that, prior to the date in question, was a client, customer, payor, referral source, or facility of the Corporation or any of its affiliates; or (ii) hire, entice away or in any other manner persuade any person who was an employee, consultant, representative or agent of the Corporation or any of its affiliates on or at any time within one (1) year prior to the date in question, to alter, modify or terminate their relationship with the Corporation or any of its affiliates.

    **(d)**    <u>Necessary Restrictions</u>. Executive acknowledges that the restrictions contained in this Agreement are reasonable and necessary to protect the legitimate business interests of the Corporation and that any violation thereof by any of them would result in irreparable harm to the Corporation, and that damages in the event of any such breach of this Agreement will be difficult, if not impossible, to ascertain. Accordingly, Executive agrees that upon the violation of any of the restrictions contained in this Agreement, the Corporation shall be entitled to obtain from any court of competent jurisdiction a preliminary and permanent injunction as well as any other relief provided at law, equity, under this Agreement or otherwise, without the necessity of posting any bond or other security whatsoever. In the event any of the foregoing restrictions are adjudged unreasonable in any proceeding, then the parties agree that the period of time or the scope of such restrictions (or both) shall be adjusted to such a manner or for such a time (or both) as is adjudged to be reasonable. Executive represents and warrants that the provisions of this Section 7 are enforceable against him in accordance with their terms.

    **(f)**    <u>Assignment of Inventions</u>. The Executive recognizes and agrees that all ideas, inventions, patents, copyrights, copyright designs, trade secrets, trademarks, processes, discoveries, enhancements, software, source code, catalogues, prints, business applications, plans, writings, and other developments or improvements and all other intellectual property and proprietary rights and any derivative work based thereon (the "**Inventions**") made, conceived, or completed by the Executive, alone or with others, during the term of his employment, whether or not during working hours, that are within the scope of the Corporation's business operations or that relate to any of the Corporation's work or projects (including any and all inventions based wholly or in part upon ideas conceived during the Executive's employment with the Corporation), are the sole and exclusive property of the Corporation. The Executive further agrees that (1) he will promptly disclose all Inventions to the Corporation and hereby assigns to the Corporation all present and future rights he has or may have in those Inventions, including without limitation those relating to patent, copyright, trademark or trade secrets; and (2) all of the Inventions eligible under the copyright laws are "work made for hire." At the request of the Corporation, the Executive will do all things deemed by the Corporation to be reasonably necessary to perfect title to the Inventions in the Corporation and to assist in obtaining for the Corporation such patents, copyrights or other protection as may be provided under law and desired by the Corporation, including but not limited to executing and signing any and all relevant applications, assignments or other instruments. Notwithstanding the foregoing, pursuant to the Employee Patent Act, Illinois Public Act 83-493, the Corporation hereby notifies the Executive that the provisions of this Section 7(f) shall not apply to any Inventions for which no equipment, supplies, facility or trade secret information of the Corporation was used and which were developed entirely on the Executive's own time, unless (1) the Invention relates (i) to the business of the Corporation, or (ii) to actual or demonstrably anticipated research or development of the Corporation, or (2) the Invention results from any work performed by the Executive for the Corporation.

    **(g)**    <u>Remedies For Breach</u>. Executive acknowledges that the covenants contained in this Agreement are independent covenants and that any failure by the Corporation to perform its obligations under this Agreement or any other agreement shall not be a defense to enforcement of the covenants contained in this Agreement, including but not limited to a temporary or permanent injunction.

207233/0000/435564/Version #:.2

(h)     **Survival.** The provisions of Section 7 of this Agreement shall survive the termination of this Agreement.

8.     **Registration Rights.**

(a)     **Piggyback Registration Rights.** If (but without any obligation to do so) the Corporation proposes to register in a secondary offering any of its stock or other securities under the Securities Act of 1933, as amended (the "Act"), the Corporation shall, at such time, promptly give Executive written notice of such registration. Upon the written request of Executive given within twenty (20) days after his receipt of such notice, the Corporation shall, subject to the provisions of this Section 8, cause to be registered under the Act all of the shares issued to Executive pursuant the exercise of the Option granted under this Agreement (the "Registrable Securities").

(b)     **Obligations of the Corporation.** Whenever required under this Section 8 to effect the registration of any Registrable Securities, the Corporation shall, as expeditiously as reasonably possible:

(i)     Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its reasonable efforts to cause such registration statement to become effective.

(ii)     Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Act with respect to the disposition of all securities covered by such registration statement.

(iii)     Furnish to Executive such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Act, and such other documents as he may reasonably request in order to facilitate the disposition of Registrable Securities.

(iv)     Use its reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by Executive, provided that the Corporation shall not be required to qualify to do business or to file a general consent to service or process in any such states of jurisdictions.

(v)     In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering.

(vi)     Notify Executive at any time when a prospectus relating thereto is required to be delivered under the Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(c)     **Furnish Information.** It shall be a condition precedent to the obligations of the Corporation to take any action pursuant to this Section 8 with respect to the Registrable Securities of Executive that Executive shall furnish to the Corporation such information regarding himself, the Registrable Securities held by him, and the intended method of disposition of such securities as shall be required to effect the registration of the Registrable Securities.

(d)     **Underwriting Requirements.** In connection with any offering involving an

underwriting of shares being issued by the Corporation, the Corporation shall not be required under this Section 8 to include Executives securities in such underwriting unless he accepts the terms of the underwriting as agreed upon between the Corporation and the underwriters selected by it, and then only in such quantity as will not, in the opinion of the underwriters, jeopardize the success of the offering by the Corporation. If the total amount of securities, including Registrable Securities, requested by shareholders to be included in such offering exceeds the amount of securities sold other than by the Corporation that the underwriters reasonably believe compatible with the success of the offering, then the Corporation shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters believe will not jeopardize the success of the offering (the securities so included to be apportioned pro rata among the selling shareholders according to the total amount of securities entitled to be included therein owned by each selling shareholder or in such proportions thereto as shall mutually be agreed to by such selling  shareholders)

       **(e)**    **Delay of Registration**. Executive shall not have the right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 8.

       **(f)**    **Lock-up Agreements**. If reasonably requested by the Corporation and the managing underwriter, and without regard to whether or not he elects to participate in the offering, the Executive agrees to enter into lock-up agreements pursuant to which he will not offer, sell or otherwise dispose of the Registrable Securities or other equity securities of the Corporation, except the Registrable Securities sold pursuant to such registration statement, without the prior consent of the Corporation and the managing underwriter, provided that the other officers and directors of the Corporation enter such lock-up agreements for the same period (180 days in the case of an initial public offering by the Corporation, 90 days otherwise) and on the same terms.

    **9.**    **Invalid Provision.** The invalidity or unenforceability of a particular provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

    **10.**    **Modification.** No change or modification of this Agreement shall be valid unless in writing and signed by the parties hereto. No failure or delay by the Corporation in exercising any right, power or remedy hereunder upon a breach hereof shall constitute a waiver of any such term, condition, covenant, agreement, right or power of the Corporation or prohibit the Corporation from exercising any such rights, power or remedy at any later time or times.

    **11.**    **Excise Tax.** In the event that any payment or benefit received or to be received by Executive in connection with a termination of his employment with the Corporation would constitute a "parachute payment" within the meaning of Code Section 280G or any similar or successor provision to 280G and/or would be subject to any excise tax imposed by Code Section 4999 or any similar or successor provision then the Corporation shall assume all liability for the payment of any such tax and the Corporation shall immediately reimburse Executive on a "grossed-up" basis for any income taxes attributable to Executive by reason of such Corporation payment and reimbursements.

    **12.**    **ARBITRATION.** ANY CONTROVERSIES BETWEEN THE CORPORATION AND EXECUTIVE INVOLVING THE CONSTRUCTION OR APPLICATION OF ANY OF THE TERMS, PROVISIONS OR CONDITIONS OF THIS AGREEMENT, SAVE AND EXCEPT FOR ANY BREACHES ARISING OUT OF SECTION 7 HEREOF, SHALL ON THE WRITTEN REQUEST OF EITHER PARTY SERVED ON THE OTHER BE SUBMITTED TO ARBITRATION. SUCH ARBITRATION SHALL COMPLY WITH AND BE GOVERNED BY THE NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES RULES OF THE AMERICAN ARBITRATION ASSOCIATION. AN ARBITRATION DEMAND MUST BE MADE WITHIN ONE (1) YEAR OF THE DATE ON WHICH THE

207233/0000/435564/Version 1:.2

PARTY DEMANDING ARBITRATION FIRST HAD NOTICE OF THE EXISTENCE OF THE CLAIM TO BE ARBITRATED, OR THE RIGHT TO ARBITRATION ALONG WITH SUCH CLAIM SHALL BE CONSIDERED TO HAVE BEEN WAIVED. AN ARBITRATOR SHALL BE SELECTED ACCORDING TO THE PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION. THE DECISION OF THE ARBITRATOR SHALL BE RENDERED WITHIN THIRTY (30) DAYS OF THE CLOSE OF THE ARBITRATION HEARING AND SHALL INCLUDE WRITTEN FINDINGS OF FACT AND CONCLUSIONS OF LAW REFLECTING THE APPROPRIATE SUBSTANTIVE LAW. JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF IN THE STATE OF ILLINOIS. IN REACHING HIS OR HER DECISION, THE ARBITRATOR SHALL HAVE NO AUTHORITY (A) TO AUTHORIZE OR REQUIRE THE PARTIES TO ENGAGE IN DISCOVERY (PROVIDED, HOWEVER, THAT THE ARBITRATOR MAY SCHEDULE THE TIME BY WHICH THE PARTIES MUST EXCHANGE COPIES OF THE EXHIBITS THAT, AND THE NAMES OF THE WITNESSES WHOM, THE PARTIES INTEND TO PRESENT AT THE HEARING), (B) TO INTERPRET OR ENFORCE SECTION 7 OF THE AGREEMENT (FOR WHICH SECTION 14 SHALL PROVIDE THE EXCLUSIVE VENUE), (C) TO CHANGE OR MODIFY ANY PROVISION OF THIS AGREEMENT, (D) TO BASE ANY PART OF HIS OR HER DECISION ON THE COMMON LAW PRINCIPLE OF CONSTRUCTIVE TERMINATION. THE COST OF ARBITRATION SHALL BE BORN BY THE LOSING PARTY OR IN SUCH PROPORTIONS, AS THE ARBITRATOR SHALL DECIDE. THE ARBITRATOR SHALL HAVE NO AUTHORITY TO ADD TO, SUBTRACT FROM OR OTHERWISE MODIFY THE PROVISIONS OF THIS AGREEMENT, OR TO AWARD PUNITIVE DAMAGES TO EITHER PARTY.

13. **Attorneys' Fees and Costs**. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which he may be entitled.

14. **Applicable Law**. This Agreement shall be governed by and interpreted under the internal laws of the State of Illinois. The Executive consents to submit to personal jurisdiction in the State of Illinois in any state or federal court of competent subject matter jurisdiction situated in Cook County, Illinois.

15. **Binding Effect**. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

16. **Assignability.** This Agreement is assignable by the Corporation but is not assignable by Executive. Executive agrees to execute all documents necessary to ratify and effectuate any such assignment. If this Agreement is assigned by the Corporation, the term "Corporation" used herein shall refer to and be binding upon the Corporation's transferee or assignee.

17. **Deductions and Withholding**. The Executive agrees that the Corporation shall be entitled to withhold from any and all payments required to be made to the Executive pursuant to this Agreement all federal, state, local and/or other taxes which the Corporation determines are required to be withheld in accordance with applicable statutes and/or regulations from time to time in effect.

18. **Release**. In consideration of the Corporation's agreement to enter into this Agreement, the Executive hereby agrees as follows:

(a) The Executive, on behalf of himself and his heirs, executors, administrators, successors and assigns, hereby irrevocably and unconditionally releases and discharges the Corporation, its past and present officers, directors, trustees, agents, owners, shareholders, representatives, employees, parents, subsidiaries, successors and

207233/0000/435564/Version #:.2

assigns (collectively, "Releasees"), jointly and individually, from any and all actions, causes of action, obligations, liabilities, judgments, suits, debts, attorneys' fees, costs, sums of money, accounts, options, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, extents, executions, claims and demands whatsoever in law or in equity, that he ever had, now has or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the date hereof;

(b)     The claims released pursuant to Section 18(a) include, without limitation, (i) any claims of discrimination on the basis of sex, sexual harassment, disability, handicap, race, racial harassment, color, religion, creed, national origin, ancestry or age, including, without limitation, any rights or claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Fair Labor Standards Act or any other similar federal, state or local law, rule or regulation or executive order, (ii) any claims of wrongful discharge or termination, breach of contract (whether written or oral, express or implied), breach of promise, violation of public policy, negligence, whistleblower activities, retaliation, defamation, impairment of economic opportunity, loss of business opportunity, fraud, misrepresentation, disability, perceived disability, history of disability and payment of wages, commissions, overrides, vacation pay, sick pay or any other employment benefits, including, without limitation, claims under the Employee Retirement Income Security Act of 1974, and (iii) any claims for attorneys' fees or costs.

(c)     It is further agreed and understood that nothing contained in this Agreement (including, without limitation, this Section 18), nor the fact that the Corporation has provided the Executive with consideration hereunder, shall be considered or deemed to be an admission of any wrongdoing or violation or breach of any federal, state or local law, rule or regulation or executive order or of any duty owed to the Executive by the Corporation and/or any of the other Releasees.

(d)     By signing this Agreement, Executive acknowledges and agrees that:

(i)     He has been afforded a reasonable and sufficient period of time to review this Agreement (including, without limitation, this Section 18) for deliberation hereon and for negotiation of the terms herein, he has been specifically urged by the Corporation to consult with legal counsel or a representative of his choice before signing this Agreement, and he has, in fact, consulted with counsel in connection with the review and negotiation of this Agreement (including, without limitation, this Section 18).

(ii)    He has carefully read and understands the terms of this Agreement (including, without limitation, this Section 18), each of which have been fully explained to him.

(iii)   He has entered into this Agreement (including, without limitation, this Section 18) freely and voluntarily and without duress or coercion and with full knowledge of its significance and consequences and of the rights and claims relinquished, surrendered, released and discharged hereunder.

207233/0000/435564/Version #:.2

(iv)  The only consideration for signing this Agreement are the terms stated herein and no other promise, agreement or representation of any kind has been made to him or by any person or entity whatsoever to cause him to enter into this Agreement.

(v)  He was offered a minimum period of at least 21 days after receipt of this Agreement to review it (including, without limitation, this Section 18), but that he specifically requested that such minimum period be waived because he did not wish to wait the full 21 days, and that such request and waiver were initiated solely by him, were voluntary on his part and were without any duress or coercion of any kind.

(e)  Executive acknowledges and understands that this Agreement (including, without limitation, this Section 18) may be revoked by him in writing at any time during the period of 7 days following the date of his execution of this Agreement by delivering such written revocation to the Corporation's President.  If such 7-day revocation period expires without his exercising his revocation rights, the obligations of this Agreement (including, without limitation, this Section 18) will then become fully effective and irrevocable.

19.  **Notices.** All notices, demands, requests, consents, approvals or other communications required or permitted hereunder shall be in writing and shall be delivered by hand, registered or certified mail with return receipt requested or by a nationally recognized overnight delivery service, in each case with all postage or other delivery charges prepaid, and to the address of the party to whom it is directed as indicated below, or to such other address as such party may specify by giving notice to the other in accordance with the terms hereof. Any such notice shall be deemed to be received (a) when delivered, if by hand, (b) on the next business day following timely deposit with a nationally recognized overnight delivery service, or (c) on the date shown on the return receipt as received or refused or on the date the postal authorities state that delivery cannot be accomplished, if sent by registered or certified mail, return receipt requested.

If to the Corporation:

Restaurant.com, Inc.
1040 Avenue of the Americas
New York, New York 10018
Attn:  Cary Chessick,
       Executive Vice President

If to the Executive:

Steve Savad
105 West 89th Street Apt. GA

New York, NY 10024

20.  **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same instrument.

207233/0000/435564/Version #: .2

**IN WITNESS WHEREOF**, the undersigned have hereunto executed this Agreement on the date set forth above.

**CORPORATION:**                                    **EXECUTIVE:**

RESTAURANT.COM, INC.

By: _____              _____
        Stephen R. Fleischer                              Steve Savad
        President

207233/0000/435564/Version f:.2

**Exhibit A**
**Option Agreement**

STOCK OPTION AGREEMENT made as of the 14th day of September 2001 between RESTAURANT.COM, INC., a Delaware corporation (the "Company"), and Steve Savad (the "Optionee").

WHEREAS, the Optionee is a director and executive of the Company;

WHEREAS, the Company desires to provide to the Optionee an additional incentive to promote the success of the Company;

NOW, THEREFORE, in consideration of the foregoing, the Company hereby grants to the Optionee the right and option to purchase Common Shares of the Company under and pursuant to the terms and conditions of the Company's 1999 Stock Option Plan (the "Plan") and upon and subject to the following, terms and conditions:

1. **GRANT OF OPTION.** The Company hereby grants to the Optionee the right and option (the "Option") to purchase up to One Million Four Hundred Fourteen Thousand and Three Hundred and Eighty Six (1,414,386) shares of common stock of the Company (the "Option Shares"). All or any part of the Option Shares may be purchased during the period commencing on the date of this Stock Option Agreement and ending July 31, 2010 (the "Expiration Date"). The Option shall be fully vested and exercisable on the date of grant.

2. **NATURE OF OPTION.** Such Options to purchase the Option Shares are intended to be "Nonstatutory Stock Options" as such term is defined in the Plan.

3. **EXERCISE PRICE.** The exercise price of each of the Option Shares shall be 2.4 Cents ($0.024) (the "Option Price") payable in cash only. The Company shall pay all original issue or transfer taxes on the exercise of the Option.

4. **EXERCISE OF OPTIONS.** The Option shall be exercised in accordance with the provisions of the Plan. As soon as practicable after the receipt of notice of exercise (in the form annexed hereto as Exhibit A) and payment of the Option Price in cash in the manner provided for in the Plan, the Company shall tender to the Optionee certificates issued in the Optionee's name evidencing the number of Option Shares covered thereby.

5. **TRANSFERABILITY.** The Option shall not be transferable other than by will or the laws of descent and distribution and, during the Optionee's lifetime, shall not be exercisable by any person other than the Optionee.

6. **EARLY EXPIRATION.** Notwithstanding anything to the contrary herein or in the Plan, including, but not limited to, Section 12 of the Plan (other than a termination for cause which shall continue to be subject to the terms of Section 12 of the Plan), upon a termination of the Optionee's employment, the Option shall continue to be exercisable until July 31, 2010.

7. **INCORPORATION BY REFERENCE.** Except as otherwise set forth herein, the terms and conditions of the Plan are hereby incorporated by reference and made a part hereof.

8. **NOTICES.** Any notice or other communication given hereunder shall be deemed sufficient if in writing and hand delivered or sent by registered or certified mail, return receipt requested, addressed to the Company, 1040 Avenue of the Americas, 24th Floor, New York, New York, 10018 Attention: President and to the Optionee at the address indicated below. Notices shall be deemed to have been given on the date of hand delivery or mailing, except notices of change of address, which shall be deemed to have been given when received.

9.    **BINDING EFFECT.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

10.    **ENTIRE AGREEMENT.** This Agreement, together with the Plan, contains the entire understanding of the parties hereto with respect to the subject matter hereof and may be modified only by an instrument executed by the party sought to be charged.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the day and year first above written.

**RESTAURANT.COM, INC.**

By _____
        Stephen R. Fleischer
        President

_____
        Steve Savad

207233/0000/435564/Version #:.2

EXHIBIT A

## NOTICE OF EXERCISE

The undersigned hereby exercises options to purchase _____ Common Shares of Resaurant.com, Inc., a Delaware corporation (the "Company") and delivers to the Company herewith a check or cash in the amount of $ _____, or $_____ per share.

Dated: _____

_____
(Signature)

_____
(Name of Optionee)

_____
(Address)

_____
(Social Security Number)

15

207233/0000/435564/Version #:.2